[No. 3387.]

Sisters of Charity of Cincinnati v. Burke et al.

1. Contracts—*Construction—Building Contract—Written Order for Extras.* The contractor for the installation of a steam heating plant, at the request of one representing the owner, furnishes appliances not specified in the written contract for the work. The owner after they are furnished and put in agrees to pay first cost therefor, and the cost is arrived at by mutual agreement. The contractor is entitled to a lien for such cost price, though the contract stipulates that no extras shall be charged for unless upon written order from the superintendent, or a previous adjustment of the amount to be paid therefor.

2. Appeals—*Findings on Sufficient Competent Evidence,* will not be reviewed.

*Appeal from Pueblo District Court.* Hon. Charles S. Essex, Judge.

Mr. F. R. McAliney, for appellant.

Messrs. Hartman & Ballreich, Mr. Charles L. Avery, for appellees.

Cunningham, Judge.

The Sisters of Charity, of Cincinnati, Ohio, a corporation, appellant here, defendant below, entered into a contract with appellee, Burke, whereby the latter was to install a steam heating system in a hospital owned and operated by appellant in the city of Pueblo. A considerable balance of the orignal contract price remaining unpaid, Burke, together with the two appellee companies, who had furnished him material and otherwise aided him in the construction of the plant, filed their liens against the property for the balances claimed to be due them. There is no dispute as to the balances remaining unpaid the appellees on the several contracts, ex-

cept as to the amount claimed by Burke for certain extras or alterations. Appellant contends (a) that the lien statements were not filed in apt time (b) that the work done by Burke was radically defective, and the steam heating plant wholly unsuitable for the purpose for which it was designed.

1. The trial was to the court without a jury. Specific findings of fact were made by the judge, which, if correct, or warranted by the evidence, justified the judgment entered thereon in favor of appellees. Upon every material question of fact necessary to support the findings and judgment, the evidence is in hopeless conflict, where same is contradicted at all by appellant. All the evidence concerning the manner in which Burke performed his work, and the causes of the unsatisfactory behavior of the plant, was given by witnesses who testified in open court. Various witnesses of experience testified on behalf of the plaintiffs, and the defendant. Plaintiffs' witnesses pronounced the plant satisfactory in all respects, and attributed its unsatisfactory working entirely in the incompetency of the engineer employed by defendant. Defendant's witnesses testified that the plant was defective in almost every respect. The trial court evidently accepted the testimony of the plaintiffs' witnesses and rejected that given by defendant's witnesses, wherever there was a conflict in the evidence. As we read the record, there is in it ample evidence to support the findings and judgment of the trial court, including the finding that the liens were filed in apt time.

2. Complaint is made by appellant that certain extras were furnished by Burke without a written order from the superintendent or a previous de-

termination of the amount which should be paid by the owner or allowed by the contractor for the same. This is an apparent departure from one of the conditions of the written contract under which Burke was performing the work. But, it appears from the evidence that those extras or alterations were made at the request of a representative of the Hospital Company, and under her observation. Moreover, after some wrangling as to what Burke should be allowed for them, he agreed to put them in at their actual cost to him, and he testified that the representative of the Hospital Company consented and agreed to pay that price for them, and at the same time it was determined what the extras at such cost prices aggregated. Under such circumstances we think the extras were properly allowed by the trial court.

*Chicago E. & L. R. Co. v. Moran*, 187 Ill., 316; 58 N. E., 335. *Kilby Mfg. Co. v. Hinchman Co.*, 132 Fed., 957. *Galliope M. Co. v. Herzenger*, 21 Colo., 482.

There were certain alterations made in the plans, after the same were signed. The principal change or alteration involved the substitution of a cement sump for an iron or metallic catch basin. This catch basin, as we understand it, was designed to take care of the returning water produced by the condensation of the steam in its rounds through the building. Burke had ordered the metallic catch basin provided for in the plans, when he was directed by a representative of the heating company to substitute the cement sump, for reasons not necessary here to set forth. The heating company, as we shall presently see, was designated in the Burke

contract as the superintendent under whose direction he was to act in installing the plant. There is also evidence that the substitution of the sump was ordered by the heating company after a consultation between its representative and one Flaherty, and an agreement on the part of Flaherty that such change was necessary. There is a sharp dispute on the question of Flaherty's authority to represent or bind the Hospital Company, but it must be conceded that there is substantial evidence that he possessed such authority. Moreover, the trial court found that a representative of the hospital, one of the Sisters, was present when this and all other changes were required, and consented thereto, and we think there is evidence sufficient to support this finding, which is the only thing within our province to determine. Furthermore, there is no dispute but what one P. P. Mills was the architect or superintendent who represented the interests of the Hospital Association during the entire construction of the building, including the installation of the heating plant. After the plant had been substantially completed, certainly after the substitution of the cement for the metallic sump, Mr. Mills gave to Burke the following certificate:

"This is to certify that I accept the steam heating for the addition to St. Mary's sanitarium and laundry, Pueblo, Colo., as to present utility and efficiency."

Mills was probably prompted to thus qualify his certificate by the fact that there was in the contract a provision for a test of the steam plant which could only be made in extremely cold weather. It further appears that for more than a year the ce-

ment sump had been in use, and no specific complaint was made of it; the sole complaint by the proprietors of the hospital being that the plant did not work satisfactorily. The cause of the defective working, we have already considered and disposed of.

It seems probable that the connecting of the catch basin with the sewer was, as appellant contends, a very desirable arrangement, but there is nothing in the evidence to show that the plans of the contract under which Burke performed his work, required him to so connect it, and there is evidence tending, at least, to establish appellee's contention that such connection was not necessary.

3. By the terms of the written contract under which Burke installed the plant, it was provided that in the event of the refusal or neglect of the contractor to supply a sufficiency of properly skilled workmen, or in the event of his neglect or failure in other respects, that the owner might, after ten days' written notice to the contractor, take charge of and complete the work, charging to the contractor whatever the same might cost the owner to complete. The plant was practically completed, but not working well. After calling Burke's attention to the defect on several occasions, appellant, the owner, employed another steam fitter to take complete charge of the plant, authorizing him to make any alterations or changes that he might see fit. All this without any notice whatever to either Burke or the Automatic Heating Company, which, by the terms of the Burke contract, was made the arbiter and superintendent in connection with Burke's construction of the plant. Upon every occasion that

complaint was made to Burke by the proprietors of the hospital, touching the working of the plant, he seems to have promptly responded, and he testified that on each of the eight or nine occasions he was able, by a proper manipulation of the engine and pumps, to stop the "pounding," which was the chief complaint made against the working of the plant, and succeedel in heating up the rooms satisfactorily. His testimony in this behalf was uncontradicted. He further testified that he was at the plant on Saturday before Morgan was set to work by the owners on Monday, arranging to install certain devices calculated to guard against even the inefficiency of the engineer. On Monday when he returned to the plant with these devices which he had ordered, he found Morgan in charge and at work making repairs. Morgan, the mechanic employed by the owner to reconstruct the work, seems to have practically rebuilt it. At any rate, he charged and was paid almost $2,000 for his work, whereas the original cost of the plant was about $5,500. After the plant was thus reconstructed by Morgan, it appears to have given satisfaction, but it also appears that at or about that time there was a change made in engineers. It may be that the plant as reconstructed by Morgan was a more satisfactory institution; certainly it was a much more expensive one. Burke's plans called for the installation of what is known as the Paul system. This system had been selected by the Hospital Company, and with its selection Burke had nothing whatever to do. It was his duty, under the contract, to install it under the superintendency of the Automatic Heating Company that controlled the

Paul system, which was a patented device. He appears to have installed it to the entire satisfaction of the Automatic Company, and they gave him a certificate in writing to that effect, and also on the stand testified that he had followed their plans absolutely, and that his work was even better than his contract called for. By the Burke contract it was provided: "that the work included in this contract is to be done under the direction of the said superintendents, and that their decision as to the construction and meaning of the drawings and specifications shall be final." As we have said, the superintendent was the Automatic Heating Company, who gave the above mentioned certificate to Burke. Mr. Siebenman, who represented the company in superintending the work, and in drawing the specifications, testified that he had been advised by the Sisters that their means were limited, and that they would have to be careful about the expenses, and that he had in mind this fact when drawing specifications, that is, that the item of costs was an important one to the Sisters. Hence as we have observed, it is not improbable that after spending $2,000 more in the way of repairs, the plant may have been improved by the Hospital Company. However, this fact is disputed by several experienced witnesses who were called by appellees. These witnesses testified that all the alterations made by Morgan were quite unnecessary.

In view of the conflicting evidence, and the sweeping findings of the trial court, in every instance in favor of the appellees, we deem it our duty to affirm the judgment, which is accordingly done.                                        *Affirmed.*